**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>No. 16-MD-2724-CMR<br>HON. CYNTHIA M. RUFE |
| _____ | |
| IN RE: CLOBETASOL CASES | |
| _____ | |
| THIS DOCUMENT RELATES TO: | 16-CB-27243 |
| *ALL INDIRECT RESELLER PLAINTIFF (IRP) ACTIONS* | **CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

**INDIRECT RESELLER PLAINTIFFS'**
**CONSOLIDATED CLOBETASOL CLASS ACTION COMPLAINT**

**FILED WITH REDACTIONS – PUBLIC VERSION**

# TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................................ 1

II.   ONGOING FEDERAL AND STATE INVESTIGATIONS.................................... 4

III.  THE ROLE OF INDEPENDENT PHARMACIES.............................................. 10

IV.   JURISDICTION AND VENUE ........................................................................... 11

V.    PARTIES ............................................................................................................. 12

      A.    Plaintiffs ................................................................................................... 12

      B.    Defendants ................................................................................................ 13

      C.    Co-Conspirators ....................................................................................... 15

VI.   INTERSTATE COMMERCE ............................................................................. 15

VII.  BACKGROUND ON THE GENERIC DRUG INDUSTRY ............................... 16

      A.    Generic drugs are commodity products that compete on price............... 16

      B.    Pricing in the generic drug industry discourages unilateral price increases ........ 20

VIII. THE GENERIC CLOBETASOL CONSPIRACY .............................................. 22

      A.    The Clobetasol market ............................................................................. 22

      B.    Defendants increased the price of Clobetasol ......................................... 23

      C.    As part of the conspiracy, Defendants Hi-Tech, Sandoz, Taro, and Wockhardt
            increased their WAC benchmarks in lockstep. ...................................... 25

      D.    No shortages or other market changes can justify Defendants' price increases ... 43

      E.    Defendants had many opportunities to conspire on Clobetasol........................... 45

      F.    Defendants acknowledge the lack of generic drug competition ........................... 56

      G.    Defendants' concerted efforts to increase prices for generic Clobetasol yielded
            supracompetitive profits.......................................................................... 57

      H.    The Clobetasol market is susceptible to collusion ................................. 59

            1.    Industry concentration ................................................................. 59

            2.    Barriers to entry ........................................................................... 62

            3.    Demand inelasticity ...................................................................... 63

            4.    Lack of substitutes ........................................................................ 65

            5.    Standardized product with high degree of interchangeability .................... 66

            6.    Inter-competitor contacts and communications ........................................... 67

IX.   THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .............. 72

i

FILED WITH REDACTIONS – PUBLIC VERSION

A.   The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy ........................................... 72

B.   Concealment tolled the statutes of limitations ....................................... 75

1.   Active concealment of the conspiracy ........................................ 76

X.   CONTINUING VIOLATIONS ........................................................ 77

XI.   DEFENDANTS' ANTITRUST VIOLATIONS................................... 78

XII.   CLASS ACTION ALLEGATIONS ................................................. 80

XIII.CAUSES OF ACTION .................................................................. 84

XIV. PRAYER FOR RELIEF ............................................................... 127

XV. JURY DEMAND ........................................................................ 129

**FILED WITH REDACTIONS – PUBLIC VERSION**

# I.      NATURE OF THE ACTION

1.      This suit brings claims on behalf of indirect purchasers of generic Clobetasol propionate ("Indirect Reseller Plaintiffs," "independent pharmacies," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic versions of the prescription drug Clobetasol propionate.  The generic Clobetasol propionate formulations at issue in this lawsuit are (1) topical cream 0.05%, (2) topical emollient cream 0.05%, (3) topical ointment 0.05%, (4) topical gel 0.05%, or (5) topical solution 0.05% (collectively "Clobetasol").[1]

2.      Clobetasol is a high potency topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo.  It is one of the most widely prescribed dermatological drugs in the United States.

3.      For many years, competition among the small group of sellers of Clobetasol kept prices stable, at low levels.  But starting in July 2014, Defendants, who dominate the market for Clobetasol, abruptly and inexplicably raised prices.  The price increases were extreme and unprecedented.  During the summer of 2014, prices of Clobetasol increased by an average of 1,144%, and in some instances by more than 1,700%.  Prices remain at supracompetitive levels today.

4.      Defendants' unlawful and anticompetitive conduct in the Clobetasol markets is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

---

[1] In addition to the above-referenced formulations, Clobetasol propionate is also sold in foam, emollient foam, lotion, spray, and shampoo formulations. "Clobetasol" as used in this Complaint refers only to the cream, emollient cream, ointment, gel, and solution formulations at issue in this action.

FILED WITH REDACTIONS – PUBLIC VERSION

5.    The price increases imposed by Defendant manufacturers of generic Clobetasol cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result of unilateral business decisions.  Instead, the significant increases in the prices of Clobetasol were the result of an illegal agreement among Defendants to fix prices.

6.    The markets for Clobetasol were highly conducive to collusion, as they were controlled almost exclusively by the Defendants and are subject to high barriers to entry, including substantial manufacturing costs and regulatory requirements.  Because Clobetasol is a medically necessary product for which reasonable substitutes are not available and demand is inelastic, Defendants were able to raise prices in concert without suffering corresponding losses in sales volume.  Federal regulations require Defendants' Clobetasol products to contain the same type and amount of active pharmaceutical ingredients and to be therapeutically equivalent to one another. They are therefore interchangeable commodity products.  Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing or market allocation agreement.  In addition, Sandoz facilitated Defendants' conspiracy by ensuring that potentially competing branded versions of Clobetasol were either more expensive than the price-fixed generics or were withdrawn from the market entirely.

7.    Because purchasers choose whose Clobetasol product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

8.    As alleged below, Defendants implemented their conspiracy through numerous meetings and communications, including trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), the

2

National Association of Chain Drug Stores ("NACDS"), ████████████████

████████████████████████████████████████████████████████

████████████████████████████████

9.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Clobetasol—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

10.     An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of doxycycline hyclate and glyburide.  But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

11.     The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of the generic drug industry parallel to that of DOJ, confirms that its price-fixing investigation extends "way beyond the two drugs and the six companies. Way beyond… We're learning new things every day."[4] There is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market

---

[2] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[3] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[4] "How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices," Kaiser Health News (Dec. 21, 2016) *available at* http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices.

**FILED WITH REDACTIONS – PUBLIC VERSION**

generic drugs in the United States . . .[and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[5]

12.     Manufacturers of Clobetasol are implicated in these ongoing investigations; at least four of the Defendants named here, including Actavis, Perrigo, Sandoz, and Taro, have received a federal grand jury subpoena and/or been raided by the Department of Justice as part of the generic drug price-fixing investigations.

13.     Plaintiffs have paid many millions of dollars more than they would have in competitive markets for Clobetasol.

14.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of all privately-held pharmacies in the United States and its territories that indirectly purchased generic Clobetasol products manufactured by any Defendant, from June 1, 2014 to the present ("Class Period"), and (b) a damages class of all privately-held pharmacies in certain states that indirectly purchased generic Clobetasol products manufactured by any Defendant, from June 1, 2014 to the present.

## II.     ONGOING FEDERAL AND STATE INVESTIGATIONS

15.     Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government

---

[5] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

**FILED WITH REDACTIONS – PUBLIC VERSION**

alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of glyburide and doxycycline hyclate in violation of the Sherman Act (15 U.S.C. § 1).[6]

16.    On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[7]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained: "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[8]  As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.  More criminal charges and guilty pleas are expected to follow.[9]

17.    Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.  The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[10]  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[11]

---

[6] Information ¶ 6, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[7] *See* Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

[8] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[9] *See, e.g.,* Eric Kroh, "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg," Law360 (Jan. 6, 2017) ("Once somebody starts cooperating, it leads to many more indictments."), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

[10] David McLaughlin & Caroline Chen, "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[11] PaRR Report, "DoJ Believes Collusion over Generic Drug Prices Widespread" (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

18.     According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.  *See In re Automotive Parts Antitrust Litig*., No. 2:12-md-02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[12]

19.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least sixteen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").

20.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make

---

[12] *Id.*

FILED WITH REDACTIONS – PUBLIC VERSION

a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[13]

21.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[14]

22.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant:  "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[15]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[16]

23.     In addition to the federal criminal investigation, the Connecticut AG began an investigation in July 2014 into the dramatic price increases in generic drugs.  Now joined by the

---

[13] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

[14] Mark Rosman & Seth Silber, "DOJ's Investigation Into Generic Pharma Pricing Is Unusual," Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[15] Richard Vanderford, "Generic Pharma Investigation Still Broad, Prosecutor Says," mLex (Feb. 21, 2017).

[16] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available a*t https://www.justice.gov/atr/page/file/926521/download.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Attorneys General of 43 other states and the District of Columbia, the Connecticut AG has filed a civil complaint in the U.S. District Court for the District of Connecticut alleging price-fixing and customer allocation.  Although the States' present complaint focuses on two drugs (doxycycline hyclate delayed release and glyburide), the States make clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and competitors" and suggest that additional drugs and manufacturers will be added "at the appropriate time."[17]

24.     The  publicly  available  version  of  the  State  AG  Complaint  is  heavily  redacted. Among  the  obscured  portions  are  the  contents  of  conspiratorial  communications,  which  the Connecticut AG has described as "mind-boggling."[18]  The State AG Complaint explains that the generic  drug  industry  is  structured  in  a  way  that  facilitates  these  types  of  collusive communications. "Generic drug manufacturers operate, through their respective senior leadership and  marketing  and  sales  executives,  in  a  manner  that  fosters  and  promotes  routine  and  direct interaction among their competitors."  This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."[19]

25.     The  indictments and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and

---

[17] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) ("State AG Amended Complaint").

[18] Mark Pazniokus, "How a small-state AG's office plays in the big leagues," CT Mirror (Jan. 27, 2017), *available at* http://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/.

[19] State AG Amended Complaint ¶ 7.

8

long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."[20]

26.     And at least four of the Defendants are the targets of investigations by federal antitrust regulators concerning the pricing of their generic pharmaceutical products, including Clobetasol.  In its August 8, 2015 10-Q, Allergan (Actavis's corporate parent) announced that on June 25, 2015, Actavis had "received a subpoena from the U.S. Department of Justice ('DOJ'), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."  On September 8, 2016, Taro's parent company announced that Taro, "as well as two senior officers in its commercial team, received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."  On May 2, 2017, Perrigo announced that the Antitrust Division had executed search warrants in a raid of its corporate offices as part of the DOJ's ongoing drug pricing investigation.[21] And in March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DoJ) requesting documents related to the marketing and pricing of generic pharmaceutical products…and related communications with competitors."[22]

---

[20] State AG Amended Complaint ¶ 1.

[21] http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[22] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

27.     Significantly, in a February 28, 2017 letter filed in an earlier Clobetasol action prior to its transfer to this Court, the DOJ confirmed that there are "significant overlaps between the companies and drugs that are being investigated criminally and the Defendants and drugs identified in plaintiffs' amended complaints in these civil actions [including the amended Clobetasol complaint]."[23]

28.     Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.  What is known is that starting in July 2014, after representatives of the Defendants attended meetings of the GPhA, Defendants abruptly and sharply raised their respective Clobetasol prices to nearly identical levels.  The allegations herein demonstrate that the large and unprecedented price increases for Clobetasol cannot be explained by normal, competitive market forces.  The explanation is collusion.

### III.     THE ROLE OF INDEPENDENT PHARMACIES

29.     There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

30.     The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies. Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health, Inc., or Amerisource Bergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler

---

[23] *In re: Clobetasol Antitrust Litig.*, No. 1:16-mc-7229 (S.D.N.Y), ECF No. 58 at 1.

FILED WITH REDACTIONS – PUBLIC VERSION

relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers, rig bids, or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

## IV.    JURISDICTION AND VENUE

31.    Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

32.    This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

33.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367 and by 28 U.S.C. § 1446(a).

34.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the

FILED WITH REDACTIONS – PUBLIC VERSION

offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[24]

35.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Clobetasol throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

## V.     PARTIES

### A.     Plaintiffs

36.     Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased and continues to purchase Defendants' generic Clobetasol products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

37.     Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to

---

[24] DOJ, Antitrust Division Manual at III-83.

12

purchase Defendants' generic Clobetasol products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

38.     Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Clobetasol products at supracompetitive prices during the class period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

39.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Clobetasol products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

40.     Plaintiff Deal Drug Pharmacy ("Deal Drug") is a privately held independent pharmacy in Nashville, Tennessee. Deal Drug indirectly purchased and continues to purchase Defendants' generic Clobetasol products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

41.     Plaintiff Chet Johnson Drug, Inc. ("Chet Johnson") is a privately held independent pharmacy in Amery, Wisconsin. Chet Johnson indirectly purchased Defendants' generic Clobetasol products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

**B.     Defendants**

42.     Defendant Actavis is a Delaware corporation with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceuticals U.S., Inc. acquired Allergan plc's

FILED WITH REDACTIONS – PUBLIC VERSION

generics business (including Actavis).   During the Class Period, Actavis sold Clobetasol to purchasers in this District and throughout the United States.

43.     Defendant Akorn, Inc. ("Akorn") is a Louisiana corporation with its principal place of business in Chicago, Illinois.

44.     Defendant Hi-Tech Pharmacal Co., Inc. ("Hi-Tech Pharmacal") is a Delaware corporation with its principal place of business in Amityville, New York.   In August of 2013, Akorn acquired Hi-Tech Pharmacal. In this complaint, Hi-Tech Pharmacal and Akorn are referred to collectively as "Hi-Tech."   During the Class Period, Hi-Tech sold Clobetasol to purchasers in this District and throughout the United States.

45.     Defendant Sandoz is a Colorado corporation with its principal place of business in Princeton, New Jersey.

46.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York.   Fougera is a wholly-owned subsidiary of Sandoz Inc. In this complaint, Fougera and Sandoz Inc. are referred to collectively as "Sandoz." During the Class Period, Fougera sold Clobetasol to purchasers in this District and throughout the United States.

47.     Defendant Perrigo is a Delaware corporation with its principal place of business in the Bronx, New York.   During the Class Period, Perrigo sold Clobetasol to purchasers in this District and throughout the United States.

48.     Defendant Taro is a New York corporation with its principal place of business in Hawthorne, New York.   Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli pharmaceutical company.   In 2010, Sun Pharmaceutical Industries Ltd., an Indian pharmaceutical company, acquired a controlling stake in Taro Pharmaceutical Industries, Ltd.

14

During the Class Period, Taro sold Clobetasol to purchasers in this District and throughout the United States.

49.     Defendant Wockhardt USA LLC ("Wockhardt USA") is a Delaware corporation with its principal place of business in Parsippany, New Jersey.

50.     Defendant Morton Grove Pharmaceuticals Inc. ("Morton Grove") is a Delaware corporation with its principal place of business in Morton Grove, Illinois. In this complaint, Wockhardt USA and Morton Grove are referred to together as "Wockhardt."  During the Class Period, Wockhardt sold Clobetasol to purchasers in this District and throughout the United States.

**C.     Co-Conspirators**

51.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein, although their identities are presently unknown to Plaintiffs.  In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

**VI.     INTERSTATE COMMERCE**

52.     During the Class Period, Defendants sold and distributed Clobetasol in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

53.     Defendants' and their co-conspirators' conduct, including the marketing and sale of Clobetasol, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

54.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter*

15

*alia*, drug wholesalers within each state and territory were foreclosed from offering less expensive Clobetasol to Plaintiffs inside each respective state and territory.  The foreclosure of these less expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

## VII.   BACKGROUND ON THE GENERIC DRUG INDUSTRY

### A.   Generic drugs are commodity products that compete on price

55.     Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[25]  In 2015, generic drug sales in the United States were estimated at $74.5 billion.[26]

56.     According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[27]  Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[28]

57.     In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[29]  And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic

---

[25] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[26] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[27] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[28] *Id.*

[29] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sept. 15, 2010), *available at* https://www.cbo.gov/publication/21800.

16

market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[30] Mature generic markets—like those for Clobetasol—typically have several manufacturers that compete for sales, hence keeping prices in check.

58.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[31]

59.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

60.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

61.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are

---

[30] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.
[31] GPhA Report at 1.

**FILED WITH REDACTIONS – PUBLIC VERSION**

commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[32]  Taro's parent company has explained in SEC filings that "the pharmaceutical industry in which we operate is intensely competitive. We are particularly subject to the risks of competition. For example, the competition we encounter may have a negative impact upon the prices we may charge for our products, the market share of our products and our revenue and profitability."  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

62.    It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the cheaper alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  Taro's parent company has emphasized that "[d]ue to increased competition from other generic pharmaceutical manufacturers as they gain regulatory approvals to market generic products, selling prices and related profit margins tend to decrease as products mature. . . .  These pricing pressures are inherent in the generic pharmaceutical industry."

63.    As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[32] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

**Generic Competition and Drug Prices**



Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

64.    When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.  A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[33]

65.    When there are multiple generic manufacturers in an established generic market—as with Clobetasol—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

---

[33] GAO Report at 23.

**FILED WITH REDACTIONS – PUBLIC VERSION**

**B.     Pricing in the generic drug industry discourages unilateral price increases**

66.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (e.g., a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

67.     Because the prices paid by purchasers of generic drugs differ at each level of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Marketwide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[34]  "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies," in effect "a single national average."[35]  Thus, NADAC is one way to track general price trends in the marketplace.

68.     While NADAC provides the average price level across all manufacturers of a given drug, other price measures are manufacturer-specific. Drug manufacturers typically report benchmarks—like Wholesale Acquisition Cost ("WAC")—for their drugs, which are then

---

[34] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[35] *Id.*

20

published in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price, which is sometimes subject to discounts.  In order track manufacturer-specific pricing, this complaint uses QuintilesIMS's National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.[36]

69.    When third-party payers (e.g., health plans) pay pharmacies to dispense drugs to their covered patients, the amount is typically determined with reference to a benchmark or list price like a WAC.  Some third-party payers and PBMs have implemented their own individual caps—Maximum Allowable Cost ("MAC")—that set the maximum amounts they will pay pharmacies for some generic drugs, regardless of the pharmacies' acquisition costs. A pharmacy must often dispense the drug at a loss if it cannot find a wholesaler offering the drug at a price or below the MAC cap.

70.    Although MAC caps do not apply directly to manufacturers, these caps impose a restraint on manufacturers' prices. The MAC cap essentially limits the pharmacies' discretion to adjust retail prices upwards, so pharmacies are incentivized to buy from the cheapest wholesaler and wholesalers to buy from the cheapest manufacturer. This additional pressure on prices means a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the

---

[36] IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

21

**FILED WITH REDACTIONS – PUBLIC VERSION**

loss of a significant volume of sales.  In a market with MAC caps, it is unlikely that a generic drug manufacturer would risk raising its price unless it has been agreed with competitors that they will raise their prices, too.

## VIII.   THE GENERIC CLOBETASOL CONSPIRACY

### A.     The Clobetasol market

71.     Clobetasol is a widely prescribed topical corticosteroid used for the treatment of a variety of skin conditions.  It is sold throughout the United States and its territories.

72.     The markets for Clobetasol are mature, and Defendants that operate in those markets can only gain market share by competing on price.

73.     The Clobetasol propionate products at issue in this case are the generic versions of the brand name drug Temovate (or Temovate E in the case of the emollient version of the cream), which was approved by the U.S. Food and Drug Administration in 1985 and 1994 (depending on the formulation).  Sandoz was the exclusive seller of Temovate,[37] and stopped selling Temovate emollient cream, solution and gel by early 2012.  By July 2014, Temovate cream and ointment accounted for less than 1% of total Clobetasol propionate cream and ointment sales volume. Sandoz discontinued the sale of Temovate cream and ointment on or before June 2015 and March 2016, respectively.

---

[37] Temovate was developed by Glaxo Wellcome (the predecessor to GlaxoSmithKline) and all formulations of Temovate were approved by the FDA prior to 1994.  The five Clobetasol proprionate formulations that are not at issue in this case (and which did not experience extraordinary price increases in July 2015) were developed by different companies under different brand names (Olux for foam, Olux-E for emollient foam, and Clobex for lotion, shampoo, and spray).  On September 30, 2005, GlaxoSmithKline sold its prescription dermatology business, including the rights to Temovate, to Altana, Inc., which became Fougera in 2011 and was acquired by Sandoz in 2012.

FILED WITH REDACTIONS – PUBLIC VERSION

74.    Generic versions of Clobetasol propionate have been available for purchase in the United States since the mid 1990's.[38]  Several manufacturers had exited the Clobetasol markets before Defendants' July 2014 price increases.  Renaissance and Teva discontinued their Clobetasol products, and G&W Labs has no reported sales since at least January 2011.  Actavis had *de minimis* sales of some Clobetasol formulations prior to and during the initial price increases, but began selling cream in March 2015 and increased its sales of solution in August 2015.  While Tolmar received FDA approval to sell Clobetasol solution, it has no reported sales.   Glenmark Pharmaceuticals has no reported sales since at least January 2011.

75.    At all relevant times, Defendants have had substantial market power with respect to Clobetasol.  Defendants exercised this power to maintain supracompetitive prices for Clobetasol without losing so many sales as to make the elevated price unprofitable.

76.    Defendants sold Clobetasol at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

77.    During the Class Period, Defendants dominated the Clobetasol market.  Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for Clobetasol.

**B.    Defendants increased the price of Clobetasol**

78.    Competition in the Clobetasol markets had caused prices to stabilize and remain relatively low from at least January 2011 until Defendants raised prices in July 2014.  Defendants'

---

[38] *See*, *e.g*., Drugs@FDA Database, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm, ANDA 074249 (cream); ANDA 075325 (emollient cream); ANDA 074221 (ointment); ANDA 075279 (gel); ANDA 074222 (solution).

FILED WITH REDACTIONS – PUBLIC VERSION

July 2014 price increases represented a departure from the stable pricing of prior years and from ordinary pricing practices, and are indicative of collusion.

79.     Data from the National Average Drug Acquisition Cost ("NADAC")[39] for Clobetasol show the low and stable prices of Clobetasol characteristic of the markets prior to the Defendants' price hikes, and the huge spike in price that occurred abruptly in July 2014.  Since that time, Defendants have continued to charge supracompetitive prices. The emollient cream formulation of Clobetasol is but one example:



Source: NADAC Price Data

---

[39] NADAC is a measure of the cost of drugs developed by the National Association of State Medicaid Directors to set a single national pricing benchmark based on average drug acquisition costs.  NADAC price data is precise and accurate, according to the Centers for Medicare and Medicaid Services.

FILED WITH REDACTIONS – PUBLIC VERSION

80.     As the chart illustrates, prior to Defendants' price increases the prices of Clobetasol remained flat and at competitive levels.  Then, starting in July of 2014, the average price of Clobetasol increased by approximately 1,144%, with certain formulations increasing as much as 1,738%.

      **C.**     **As part of the conspiracy, Defendants Hi-Tech, Sandoz, Taro, and Wockhardt increased their WAC benchmarks in lockstep.**

81.     The market-wide Clobetasol price increases are the result of Defendants Hi-Tech, Sandoz, Taro, and Wockhardt increasing their respective Clobetasol prices at substantially the same time to substantially similar levels in the summer of 2014.  While Perrigo did not increase the price of its Clobetasol gel product until March 2016, as explained below, it would not have been rational for Perrigo to do so unless it has joined the anticompetitive agreement among the other Defendants.  And when Actavis entered the Clobetasol cream market in March 2015 and increased its sales of Clobetasol solution above *de minimis* levels in August 2015, it sold both products at elevated prices and did not compete with the other sellers on price, which it would not have done had it not also joined the conspiracy.

82.     The following graphs show the Defendants' WAC prices, which act as list prices in the pharmaceutical industry.[40]  These graphs, which use data from IMS, depict the Defendants' collusive behavior: each raised their WAC prices to essentially the same level.

---

[40] WAC prices are manufacturers' reported list prices for sale to wholesalers.  As list prices, they do not reflect discounts or rebates.

**FILED WITH REDACTIONS – PUBLIC VERSION**



FILED WITH REDACTIONS – PUBLIC VERSION



FILED WITH REDACTIONS – PUBLIC VERSION



83.     The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies.  A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts. Wholesales then sell the drug to pharmacies. The WAC serves as the benchmark for prices throughout the distribution chain.

84.     Defendants' increases of Clobetasol WAC prices—which function as list prices in the pharmaceutical industry—were accompanied by corresponding increases of Defendants' effective prices, referred to by IMS as NSP prices.  On average, Hi-Tech, Sandoz, Taro, and Wockhardt increased their NSP prices of Clobetasol by 1,170% in just six months, between May and November 2014, with Perrigo and Actavis matching the other Defendants' elevated NSP prices when they entered the markets.  Defendants' Clobetasol NSP prices remained artificially elevated long after the initial increases.  As of November 2016, Defendants' Clobetasol prices were 517% higher on average than the prices in June 2014.

28

85.     The following graphs show the IMS NSP prices charged by Defendants for the Clobetasol formulations at issue in this case.



29



30

**FILED WITH REDACTIONS – PUBLIC VERSION**



86.     **Hi-Tech**: For over three years before the Class Period began, the average effective price per unit of Hi-Tech's products was as follows, with prices generally trending downward by May 2014:

| Clobetasol Product | Pre-Class Mean Price (Dec. 2010 to May 2014) | Price (May 2014) |
|---|---|---|
| Emollient Cream .05% 30g | ■ | ■ |
| Emollient Cream .05% 60g | ■ | ■ |
| Cream .05% 15g | ■ | ■ |
| Cream .05% 30g | ■ | ■ |
| Cream .05% 45g | ■ | ■ |
| Cream .05% 60g | ■ | ■ |
| Gel .05% 15g | ■ | ■ |
| Gel .05% 30g | ■ | ■ |
| Gel .05% 60g | ■ | ■ |
| Ointment .05% 15g | ■ | ■ |
| Ointment .05% 30g | ■ | ■ |
| Ointment .05% 45g | ■ | ■ |

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Ointment .05% 60g | ■ | ■ |
| Topical Solution .05% 25ml | ■ | ■ |
| Topical Solution .05% 50ml | ■ | ■ |

87.     But starting in June 2014, Hi-Tech began a drastic increase of its effective prices:[41]

| Clobetasol Product | Price (May 2014) | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| Emollient Cream .05% 30g | ■ | ■ | ■ | ■ |
| Emollient Cream .05% 60g | ■ | ■ | ■ | ■ |
| Cream .05% 15g | ■ | ■ | ■ | ■ |
| Cream .05% 30g | ■ | ■ | ■ | ■ |
| Cream .05% 45g | ■ | ■ | ■ | ■ |
| Cream .05% 60g | ■ | ■ | ■ | ■ |
| Gel .05% 15g | ■ | ■ | ■ | ■ |
| Gel .05% 30g | ■ | ■ | ■ | ■ |
| Gel .05% 60g | ■ | ■ | ■ | ■ |
| Ointment .05% 15g | ■ | ■ | ■ | ■ |
| Ointment .05% 30g | ■ | ■ | ■ | ■ |
| Ointment .05% 45g | ■ | ■ | ■ | ■ |
| Ointment .05% 60g | ■ | ■ | ■ | ■ |
| Topical Solution .05% 25ml | ■ | ■ | ■ | ■ |
| Topical Solution .05% 50ml | ■ | ■ | ■ | ■ |

88.     Hi-Tech's effective prices continued to climb, peaking later with increases as much

as ■

| Clobetasol Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| Emollient Cream .05% 30g | ■ | ■ | ■ |
| Emollient Cream .05% 60g | ■ | ■ | ■ |
| Cream .05% 15g | ■ | ■ | ■ |
| Cream .05% 30g | ■ | ■ | ■ |
| Cream .05% 45g | ■ | ■ | ■ |

---

[41] Effective prices are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as 12 decimals).

FILED WITH REDACTIONS – PUBLIC VERSION

| Clobetasol Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| Cream .05% 60g | | | |
| Gel .05% 15g | | | |
| Gel .05% 30g | | | |
| Gel .05% 60g | | | |
| Ointment .05% 15g | | | |
| Ointment .05% 30g | | | |
| Ointment .05% 45g | | | |
| Ointment .05% 60g | | | |
| Topical Solution .05% 25ml | | | |
| Topical Solution .05% 50ml | | | |

89.     Even today, Hi-Tech's effective prices remain high and would not have remained so high but for the price fixing conspiracy.  For example, in November 2016, its prices were as much as 2,007% higher than in May 2014:

| Clobetasol Product | Price (May 2014) | Price (Nov. 2016) | Percentage Increase |
|---|---|---|---|
| Emollient Cream .05% 30g | | | |
| Emollient Cream .05% 60g | | | |
| Cream .05% 15g | | | |
| Cream .05% 30g | | | |
| Cream .05% 45g | | | |
| Cream .05% 60g | | | |
| Gel .05% 15g | | | |
| Gel .05% 30g | | | |
| Gel .05% 60g | | | |
| Ointment .05% 15g | | | |
| Ointment .05% 30g | | | |
| Ointment .05% 45g | | | |
| Ointment .05% 60g | | | |
| Topical Solution .05% 25ml | | | |
| Topical Solution .05% 50ml | | | |

FILED WITH REDACTIONS – PUBLIC VERSION

90.    **Morton Grove:** ████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

91.    But in July and September of 2014, Morton Grove began a drastic increase of its

effective prices:

| Clobetasol Product | Price (May 2014) | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| Topical Solution .05% 25ml | | ████████████████████████████████ | | |
| Topical Solution .05% 50ml | | | | |

92.    Morton Grove's effective prices continued to climb, peaking later with increases as

much as ████████████████████████████

| Clobetasol Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| Topical Solution .05% 25ml | | ████████████████████████████ | |
| Topical Solution .05% 50ml | | | |

93.    Even today, Morton Grove's effective prices remain high and would not have

remained so high but for the price fixing conspiracy. ████████████████████

█████████████████████████████████

| Clobetasol Product | Price (May 2014) | Price (Nov. 2016) | Percentage Increase |
|---|---|---|---|
| Topical Solution .05% 25ml | | | ████████████████ |
| Topical Solution .05% 50ml | | | |

94.    **Perrigo**: For over three years before the Class Period began, the average effective

price per unit of Perrigo's products was as follows, with prices generally trending downward by

May 2014:

| Clobetasol Product | Pre-Class Mean Price (Dec. 2010 to May 2014) | Price (May 2014) |
|---|---|---|
| Gel .05% 15g | | ████████████████████ |
| Gel .05% 30g | | |

34

FILED WITH REDACTIONS – PUBLIC VERSION

| Gel .05% 60g | ███████████ | ███████████ |
|---|---|---|

95.    But starting in July 2014, Perrigo began a drastic increase of its effective prices:

| Clobetasol Product | Price (May 2014) | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| Gel .05% 15g | | | | |
| Gel .05% 30g | | ████████████████████████████████████ | | |
| Gel .05% 60g | | | | |

96.    Perrigo's effective prices continued to climb, peaking the following year with increases as much as ████████████████████████

| Clobetasol Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| Gel .05% 15g | | | |
| Gel .05% 30g | | ████████████████████████████████ | |
| Gel .05% 60g | | | |

97.    Even today, Perrigo's effective prices remain high and would not have remained so high but for the price fixing conspiracy.  For example, in November 2016, its prices were as much as █████ higher than in May 2014:

| Clobetasol Product | Price (May 2014) | Price (Nov. 2016) | Percentage Increase |
|---|---|---|---|
| Gel .05% 15g | | | |
| Gel .05% 30g | | ██████████████████████████████████ | |
| Gel .05% 60g | | | |

98.    **Sandoz**: For over three years before the Class Period began, the average effective price per unit of Sandoz's products was as follows, with prices generally trending downward by May 2014:

| Clobetasol Product | Pre-Class Mean Price (Dec. 2010 to May 2014) | Price (May 2014) |
|---|---|---|
| Cream Emollient .05% 15g | | |
| Cream Emollient .05% 30g | ██████████████████████████████████ | |
| Cream Emollient .05% 60g | | |

35

FILED WITH REDACTIONS – PUBLIC VERSION

| Clobetasol Product | Pre-Class Mean Price (Dec. 2010 to May 2014) | Price (May 2014) |
|---|---|---|
| Cream .05% 15g | | |
| Cream .05% 30g | | |
| Cream .05% 45g | | |
| Cream .05% 60g | | |
| Gel .05% 15g | | |
| Gel .05% 30g | | |
| Gel .05% 60g | | |
| Ointment .05% 15g | | |
| Ointment .05% 30g | | |
| Ointment .05% 45g | | |
| Ointment .05% 60g | | |
| Topical Solution .05% 50ml | | |

99.     But starting in June 2014, Sandoz began a drastic increase of its effective prices:

| Clobetasol Product | Price (May 2014) | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| Emollient Cream .05% 15g | | | | |
| Emollient Cream .05% 30g | | | | |
| Emollient Cream .05% 60g | | | | |
| Cream .05% 15g | | | | |
| Cream .05% 30g | | | | |
| Cream .05% 45g | | | | |
| Cream .05% 60g | | | | |
| Gel .05% 15g | | | | |
| Gel .05% 30g | | | | |
| Gel .05% 60g | | | | |
| Ointment .05% 15g | | | | |
| Ointment .05% 30g | | | | |
| Ointment .05% 45g | | | | |
| Ointment .05% 60g | | | | |
| Topical Solution .05% 50ml | | | | |

100.     Sandoz's effective prices continued to climb, peaking later with increases as much

as          above its pre-conspiracy price levels:

36

| Clobetasol Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| Cream Emollient .05% 15g | | | |
| Cream Emollient .05% 30g | | | |
| Cream Emollient .05% 60g | | | |
| Cream .05% 15g | | | |
| Cream .05% 30g | | | |
| Cream .05% 45g | | | |
| Cream .05% 60g | | | |
| Gel .05% 15g | | | |
| Gel .05% 30g | | | |
| Gel .05% 60g | | | |
| Ointment .05% 15g | | | |
| Ointment .05% 30g | | | |
| Ointment .05% 45g | | | |
| Ointment .05% 60g | | | |
| Topical Solution .05% 50ml | | | |

101.    Even today, Sandoz's effective prices remain high and would not have remained so high but for the price fixing conspiracy.  For example, in November 2016, its prices were as much as ▇▇▇▇ higher than in May 2014:

| Clobetasol Product | Price (May 2014) | Price (Nov. 2016) | Percentage Increase |
|---|---|---|---|
| Emollient Cream .05% 15g | | | |
| Emollient Cream .05% 30g | | | |
| Emollient Cream .05% 60g | | | |
| Cream .05% 15g | | | |
| Cream .05% 30g | | | |
| Cream .05% 45g | | | |
| Cream .05% 60g | | | |
| Gel .05% 15g | | | |
| Gel .05% 30g | | | |
| Gel .05% 60g | | | |
| Ointment .05% 15g | | | |
| Ointment .05% 30g | | | |

FILED WITH REDACTIONS – PUBLIC VERSION

| Clobetasol Product | Price (May 2014) | Price (Nov. 2016) | Percentage Increase |
|---|---|---|---|
| Ointment .05% 45g | | | |
| Ointment .05% 60g | | | |
| Topical Solution .05% 50ml | | | |

102.   **Taro**: For over three years before the Class Period began, the average effective price per unit of Taro's products was as follows, prices remaining very similar in May 2014:

| Clobetasol Product | Pre-Class Mean Price (Dec. 2010 to May 2014) | Price (May 2014) |
|---|---|---|
| Emollient Cream .05% 15g | | |
| Emollient Cream .05% 30g | | |
| Emollient Cream .05% 60g | | |
| Cream .05% 15g | | |
| Cream .05% 30g | | |
| Cream .05% 45g | | |
| Cream .05% 60g | | |
| Gel .05% 15g | | |
| Gel .05% 30g | | |
| Gel .05% 60g | | |
| Ointment .05% 15g | | |
| Ointment .05% 30g | | |
| Ointment .05% 45g | | |
| Ointment .05% 60g | | |
| Topical Solution .05% 25ml | | |
| Topical Solution .05% 50ml | | |

103.   But starting in June 2014, Taro began a drastic increase of its effective prices:

| Clobetasol Product | Price (May 2014) | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| Cream Emollient .05% 15g | | | | |
| Cream Emollient .05% 30g | | | | |
| Cream Emollient .05% 60g | | | | |
| Cream .05% 15g | | | | |
| Cream .05% 30g | | | | |
| Cream .05% 45g | | | | |

38

FILED WITH REDACTIONS – PUBLIC VERSION

| Clobetasol Product | Price (May 2014) | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| Cream .05% 60g | | | | |
| Gel .05% 15g | | | | |
| Gel .05% 30g | | | | |
| Gel .05% 60g | | | | |
| Ointment .05% 15g | | | | |
| Ointment .05% 30g | | | | |
| Ointment .05% 45g | | | | |
| Ointment .05% 60g | | | | |
| Topical Solution .05% 25ml | | | | |
| Topical Solution .05% 50ml | | | | |

104.    Taro's effective prices continued to climb, peaking later with increases as much as

█████ above its pre-conspiracy price levels:

| Clobetasol Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| Cream Emollient .05% 15g | | | |
| Cream Emollient .05% 30g | | | |
| Cream Emollient .05% 60g | | | |
| Cream .05% 15g | | | |
| Cream .05% 30g | | | |
| Cream .05% 45g | | | |
| Cream .05% 60g | | | |
| Gel .05% 15g | | | |
| Gel .05% 30g | | | |
| Gel .05% 60g | | | |
| Ointment .05% 15g | | | |
| Ointment .05% 30g | | | |
| Ointment .05% 45g | | | |
| Ointment .05% 60g | | | |
| Topical Solution .05% 25ml | | | |
| Topical Solution .05% 50ml | | | |

39

105.    Even today, Taro's effective prices remain high and would not have remained so high but for the price fixing conspiracy.  For example, in November 2016, its prices were as much as ███ higher than in May 2014:

| Clobetasol Product | Price (May 2014) | Price (Nov. 2016) | Percentage Increase |
|---|---|---|---|
| Cream Emollient .05% 15g | | | |
| Cream Emollient .05% 30g | | | |
| Cream Emollient .05% 60g | | | |
| Cream .05% 15g | | | |
| Cream .05% 30g | | | |
| Cream .05% 45g | | | |
| Cream .05% 60g | | | |
| Gel .05% 15g | | | |
| Gel .05% 30g | | | |
| Gel .05% 60g | | | |
| Ointment .05% 15g | | | |
| Ointment .05% 30g | | | |
| Ointment .05% 45g | | | |
| Ointment .05% 60g | | | |
| Topical Solution .05% 25ml | | | |
| Topical Solution .05% 50ml | | | |

106.    **Actavis**: With the exception of its 50 ml topical solution, Actavis did not enter the Clobetasol market until the Class Period had already begun.  Instead of competing on price, Actavis's effective prices generally peaked within a month after entering the market at supracompetitive prices comparable to the other Defendants.  Likewise, even today Actavis's prices are far above Defendants' pre-conspiracy prices.

107.    Defendants' increases in the overall per-unit prices of Clobetasol resulted in corresponding price increases for different dosages of each formulation, *e.g.*, 15mg or 60mg tubes of cream, or 25ml or 50ml bottles of solution.

FILED WITH REDACTIONS – PUBLIC VERSION

108.    Defendants' price increases for Clobetasol resulted in corresponding increases to the prices paid by Plaintiffs and members of the proposed Classes.  Corresponding increases in Clobetasol's transactional prices demonstrate that increased WAC prices translate to increases in the prices paid by independent pharmacies.

109.    No apparent, reasonable competitive justifications explain these abrupt shifts in pricing conduct.  To the contrary, anticompetitive activity explains these skyrocketing Clobetasol prices.   As Richard Evans at Sector & Sovereign Research recently wrote: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes –accommodate price inflation."[42]

110.    The price increases cannot be attributed to the need to fund research and development.  Generic pharmaceutical firms do not incur the large research and development costs that brand firms absorb in developing new drugs.  Moreover, the costs associated with developing and obtaining FDA approval for Clobetasol were incurred over 25 years ago when the drug was first introduced to the market.  Changes in ingredient costs also do not explain Defendants' price increase; the prices for five formulations of Clobetasol propionate not at issue in this case (foam, emollient foam, lotion, shampoo, and spray) remained relatively stable, even though they have the same active ingredient as the formulations that experienced dramatic price increases:

---

[42] *See* http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-aslowdown-coming.

41



111.     Defendants' enormous price increases were not due to supply disruptions.  With regard to drug shortages, federal law requires drug manufacturers to report potential shortages to the FDA, the reasons therefor, and the expected duration of the shortage,[43] but no supply disruption was reported by the relevant Defendants with respect to Clobetasol in the summer of 2014. Clobetasol does not appear in the American Society of Health-System Pharmacists databases of current and resolved drug shortages.  There were also no significant decreases in Defendants' overall sales volume that might indicate a shortage in the availability of Clobetasol's active ingredient.

112.     Defendants' Clobetasol price increases are also not explained by the entry or exit of competitors from the marketplace.  No significant sellers entered or left the Clobetasol markets between January 2011 and July 2014, and between the end of 2012 and July 2014 there was no significant shift in Defendants' relative market shares.  Prior to the price increases, the same group

---

[43] *See* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm#q.

**FILED WITH REDACTIONS – PUBLIC VERSION**

of manufacturers—the Defendants in this case—had been selling Clobetasol at the same relatively low prices for at least three years.

113.    Likewise, no unique features or circumstances of the topical corticosteroid market explain Defendants' price increases.  Prices for other topical corticosteroid products (including certain products manufactured by Defendants) remained stable while Clobetasol prices skyrocketed.  The price of halobetasol cream, for instance—which like Clobetasol is a Class I topical corticosteroid—has been stable since November 2013, ranging from an average of ███ ████████████████ and did not increase in July 2014.

**D.    No shortages or other market changes can justify Defendants' price increases**

114.    Defendants' sudden and massive price increases represented a sharp departure from the previous years of low and stable prices.

115.    Defendants engaged in a conspiracy to raise and fix the prices of Clobetasol. Defendants' reached agreement to raise their prices, and beginning in July 2014 implemented the price hikes described above, with Actavis and Perrigo joining the conspiracy and agreeing to sell their products at the same elevated prices as their co-conspirators.  This pricing behavior marked a drastic departure from Defendants' previous pricing practices with respect to Clobetasol.

116.    The price increases closely followed Defendants' participation in a workshop hosted by the Generic Pharmaceutical Association (GPhA) in North Bethesda, Maryland on June 3 and June 4, 2014.  According to GPhA records, representatives of the following Defendants attended the June 2014 GPhA workshop: Actavis, Fougera Pharmaceuticals Inc., Sandoz Inc., Hi-Tech Pharmacal, Morton Grove Pharmaceuticals, Inc., Perrigo Company, and Taro Pharmaceuticals USA, Inc.  In the months prior to implementing their agreement, Defendants also attended the annual meetings of the GPhA in February 2014 and the National Association of Chain Drug Stores (NACDS) in April 2014.  Prior to selling their Clobetasol products at elevated prices,

43

Actavis and Perrigo attended trade association meeting with the other Defendants, including GPhA meetings in February 2015, June 2015, and February 2016.

117.    Sandoz facilitated Defendants' price-fixing scheme by ensuring that its sales of Temovate—the brand name version of Defendants' Clobetasol products that are at issue in this case—did not impair Defendants' ability to increase the prices of their generic products.

118.    In early 2012, before it was acquired by Sandoz, Fougera discontinued its sales of Temovate emollient cream, gel, and solution products.  In the months before Defendants raised Clobetasol prices in July 2014, Sandoz raised the WAC prices of Temovate cream and ointment. Between January and May 2014, Sandoz increased the WAC price of Temovate cream from approximately ███████████ and increased the price of Temovate ointment from approximately ███████████.  The increased Temovate prices were higher than the generic prices Defendants adopted as part of their price-fixing conspiracy (approximately ████ by February 2016 for Clobetasol cream and ████ for Clobetasol ointment).  By increasing the prices for Temovate above even those of Defendants' price-fixed generic products, Sandoz ensured that its branded Temovate cream and ointment products would not undercut the supracompetitive prices for generic Clobetasol cream and ointment that Defendants began charging in July 2014.

119.    In late 2014 and 2015, the sales volume for Temovate cream and ointment steadily and significantly increased.  In response, rather than continuing to sell a competitor to the cartel's price-fixed generic products, Sandoz notified the FDA that it was discontinuing its sales of Temovate cream and ointment on or before June 2015 and March 2016, respectively, and the products' sales volumes rapidly declined thereafter.

120.    Absent a price-fixing agreement, Sandoz's decision to discontinue its sales of Temovate cream and ointment would have been against its economic self-interest.

### E.    Defendants had many opportunities to conspire on Clobetasol

121.    In order to be successful, collusive agreements require a level of trust among the conspirators. While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

122.    During the Class Period, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices at which Clobetasol would be sold, which had the intended and actual effect of causing Plaintiffs to pay artificially inflated prices above prices that would exist if a competitive market had determined prices for Clobetasol.

123.    Beginning in July 2014, Defendants collectively caused the price of Clobetasol to increase dramatically. It was the result of an agreement among Defendants to increase pricing and restrain competition for the sale of Clobetasol in the United States.  The agreement was furthered through Defendants' participation in trade association meetings and events, including GPhA's June 2014 CMC Workshop that took place shortly before Defendants executed their price increases.

124.    To sustain a conspiracy, the conspirators must periodically communicate to ensure that all are adhering to the collective scheme. Here, these communications occurred primarily through (1) trade association meetings and conferences, and (2) private meetings, dinners and outings among smaller groups of generic drug manufacturers.

125.    The purpose of these secret, conspiratorial meetings, discussions, and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme.

126.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the

45

**FILED WITH REDACTIONS – PUBLIC VERSION**

DOJ, and has indicated that the DOJ is investigating the extent to which trade organizations have been used as forums for collusion between sales personnel among competing generic drug companies.[44]

127.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Clobetasol, and to allocate markets and customers for Clobetasol, including, but not limited to, the GPhA, ███████████████████ ███████████████ and the National Association of Chain Drug Stores ("NACDS").

128.    The GPhA is the "leading trade association for generic drug manufacturers."[45] GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

129.    GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[46] GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

---

[44] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[45] Ass'n for Accessible Medicines, *The Association*, *available at* http://www.gphaonline.org/about/the-gpha-association.  While MDL 2724 has been pending, the GPhA changed its name to the Association for Accessible Medicines. *See* Russell Redman, *New name for Generic Pharmaceutical Association*, CHAIN DRUG REVIEW (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

[46] Ass'n for Accessible Medicines, *Membership*, *available at* http://www.gphaonline.org/about/membership.

FILED WITH REDACTIONS – PUBLIC VERSION

130.    Defendants are current or recent regular members of the GPhA. Regular Members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[47]

131.    Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors.  Don DeGolyer, President and CEO of Sandoz served in 2012 and 2013, and David Klaum, Senior Vice President & General Manager of Fougera was on the 2012 Board of Directors.  Peter Goldschmidt—President of Sandoz since late 2013—has been on the GPhA's Board of Directors since 2014.  Jim Kedrowski of Sun Pharmaceutical (Taro's parent company) joined the GPhA Board in 2016.  Former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to the price fixing and other anticompetitive activity concerning generic pharmaceuticals, also served on GPhA's Board of Directors.

132.    Defendants (or their affiliates) attended the GPhA meetings before and during the Class Period.  These meetings provided Defendants opportunities to collude.

| Event | Attendees |
|---|---|
| 2013 GPhA Annual Meeting<br><br>February 20-22, 2013<br>Orlando, Florida | • Actavis, Inc.<br>• Actavis Pharma<br>• Akorn, Inc.<br>• Perrigo<br>• Sandoz, Inc.<br>• Sandoz International GmbH<br>• Taro Pharmaceuticals<br>• Wockhardt USA, LLC |

---

[47] *Id.*

47

FILED WITH REDACTIONS – PUBLIC VERSION

| Event | Attendees |
|---|---|
| 2013 GPhA CMC Workshop<br><br>June 4-5, 2013<br>Bethesda, Maryland | • Actavis, Inc.<br>• Actavis Pharma<br>• Fougera Pharmaceuticals a Sandoz Company<br>• Hi-Tech Pharmacal Co., Inc.<br>• Morton Grove Pharmaceuticals<br>• Perrigo Company<br>• Perrigo Israel<br>• Sandoz, Inc.<br>• Sandoz International GmbH<br>• Sandoz Pharmaceuticals<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals USA, Inc. |
| 2013 GPhA Fall Technical Conference<br><br>October 28-30, 2013<br>Bethesda, Maryland | • Actavis, Inc.<br>• Actavis Elizabeth LLC<br>• Actavis Mid Atlantic LLC<br>• Akorn, Inc.<br>• Fougera Pharmaceuticals<br>• Hi-Tech Pharmacal Co., Inc.<br>• Perrigo Company<br>• Perrigo Israel<br>• Perrigo Minnesota<br>• Sandoz Canada Inc.<br>• Sandoz GmbH<br>• Sandoz, Inc.<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals USA, Inc.<br>• Wockhardt |
| 2014 GPhA Annual Meeting<br><br>February 19-21, 2014<br>Orlando, Florida | • Actavis, Inc.<br>• Fougera Pharmaceuticals Inc.<br>• Perrigo Company<br>• Sandoz Inc.<br>• Sandoz International GmbH<br>• Hi-Tech Pharmacal<br>• Morton Grove Pharmaceuticals, Inc.<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals USA, Inc. |

FILED WITH REDACTIONS – PUBLIC VERSION

| Event | Attendees |
|---|---|
| 2014 GPhA CMC Workshop<br><br>North Bethesda, Maryland<br>June 3-4, 2014 | • Actavis, Inc.<br>• Actavis Elizabeth LLC<br>• Actavis Laboratories FL, Inc.<br>• Fougera Pharmaceuticals Inc.<br>• Perrigo Company<br>• Sandoz Inc.<br>• Sandoz International GmbH<br>• Hi-Tech Pharmacal<br>• Morton Grove Pharmaceuticals, Inc.<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals USA, Inc. |
| 2014 GPhA Fall Technical Conference<br><br>October 27-29, 2014<br>North Bethesda, Maryland | • Actavis<br>• Actavis Elizabeth LLC<br>• Actavis Laboratories FL, Inc.<br>• Actavis, Inc.<br>• Actavis plc<br>• Fougera Pharmaceuticals Inc.<br>• MGP Inc. (Morton Grove Pharmaceuticals)<br>• Perrigo Company<br>• Perrigo Israel Pharmaceutical LTD<br>• Perrigo Minnesota<br>• Sandoz GmbH<br>• Sandoz, Inc.<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals Inc.<br>• Taro Pharmaceuticals USA, Inc.<br>• Wockhardt USA |
| 2015 GPhA Annual Meeting<br><br>February 9-11, 2015<br>Miami Beach, Florida | • Actavis<br>• Akorn<br>• Akorn, Inc.<br>• Perrigo Company<br>• Perrigo Company plc<br>• Sandoz, Inc.<br>• Taro Pharmaceuticals USA, Inc.<br>• Wockhardt USA LLC |

FILED WITH REDACTIONS – PUBLIC VERSION

| Event | Attendees |
|---|---|
| 2015 GPhA CMC Workshop<br><br>June 9 - 10, 2015<br>North Bethesda, Maryland | • Actavis Inc.<br>• Fougera Pharmaceuticals<br>• Sandoz, Inc.<br>• Sandoz International GmbH<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals Inc.<br>• Taro Pharmaceuticals USA, Inc.<br>• Wockhardt USA LLC |
| 2015 GPhA Fall Technical Conference<br><br>November 2 - 4, 2015<br>North Bethesda, Maryland | • Actavis<br>• Akorn, Inc.<br>• Fougera Pharmaceuticals, Inc.<br>• Perrigo Company plc<br>• Perrigo Israel Pharmaceuticals Ltd<br>• Perrigo Minnesota<br>• Sandoz Inc.<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals U.S.A., Inc. |

133.    Defendants are also members of the National Association of Chain Drug Stores. The NACDS is a national trade association representing chain pharmacies. Membership is open to generic pharmaceutical manufacturers, wholesalers, and retail pharmacies and members may participate in NACDS committees and workgroups, and attend various conferences. Akorn, Perrigo, Sandoz, Taro, and Wockhardt were all members from 2013 through 2016.

134.    On April 26-29, 2014, the NACDS held its Annual Meeting at the Phoenician resort in Scottsdale, Arizona. NACDS describes the Annual Meeting as "the industry's most prestigious gathering of its most influential leaders," and a "classic 'Top-to-Top' business conference" for the pharmaceutical retailing and manufacturing industries. Attendees are provided a list of participating companies in advance, have access to private meeting rooms where executives can meet in person, and can attend a variety of business programs, invitation-only events, and social functions.

FILED WITH REDACTIONS – PUBLIC VERSION

135.    Executives, senior management, and salespeople from Defendants Actavis, Perrigo Sandoz, Taro, and Wockhardt attended the NACDS 2014 Annual Meeting:

(a)    **Actavis**: Paul Bisaro, Actavis Board Member; Andrew Boyer, President and CEO of North America Generics; Robert Stewart, Chief Operating Officer; Michael Reed, Executive Director of Trade Relations; and Paul Reed, Sr. Director of Trade Sales and Development;

(b)    **Perrigo**: Doug Boothe, President of Generics Division; John Wesolowski, Acting General Manager; Tony Polman, National Account Executive;

(c)    **Sandoz**: Peter Goldschmidt, President of Sandoz US and Head, North America; Steven Greenstein, Director for Key Customers; Anuj Hasija, Executive Director for Key Customers; Armondo Kellum, VP of Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Scott Smith, VP Sales and Marketing;

(d)    **Taro**: Michael Perfetto, Chief Commercial Officer for Generic RX/OTC, US and Canada; Ara Aprahamian, Vice President of Sales and Marketing;

(e)    **Wockhardt**: Michael Craney, President of Sales and Marketing.

136.    Executives, senior management, and salespeople from Defendants Actavis, Akorn, Perrigo, Sandoz, Taro, and Wockhardt also attended the NACDS Annual Meeting for 2015 and Akorn, Perrigo, Sandoz, Taro, and Wockhardt attended the event in 2016; both events took place at The Breakers resort in Palm Beach, Florida.

137.    In addition to its Annual Meeting, the NACDS hosts its annual "Total Store Expo," which according to the NACDS website, is "the industry's largest gathering of its most influential leaders. It is a combination of both strategic and tactical business meetings between existing and new trading partners and is attended by industry decision makers."

FILED WITH REDACTIONS – PUBLIC VERSION

138.    On August 10-13, 2013, the NACDS held its Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  The following representatives of Defendants, among others, attended:

(a)    **Actavis**: Andrew Boyer, President and CEO North America Generics; Anthony Giannone, Executive Director of Sales; Marc Falkin, Sr. VP of Sales; Napoleon Clark, VP of Marketing;

(b)    **Akorn**: John Sabat, Sr. VP of National Accounts; M. Tranter, National Accounts Manager, Sales and Marketing;

(c)    **Perrigo**: H. James Booydegraaff, Associate Director of Marketing; Andrea Felix, National Account Executive; Kara Goodnature, Marketing Manager; Ori Gutwerg, National Account Executive; Katie McCormack, National Account Manager; Richard McWilliams, Sr. VP and General Manager; Tony Polman, National Account Executive;

(d)    **Sandoz**: Peter Goldschmidt, President of Sandoz US and Head, North America; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Armando Kellum, VP of Sales and Marketing; Paul Krauthauser, Sr. VP of Sales and Marketing; Della Lubke, National Account Executive;

(e)    **Taro**: Ara Aprahamian, VP of Sales and Marketing; Sheila Curran, VP of Sales Operations; Howard Marcus, VP of Sales and Marketing; Michael Perfetto, Chief Commercial Officer Generic RX/OTC, US and Canada; Doug Statler, Sr. Director/Head of Sales;

(f)    **Wockhardt**: Karen Andrus, Director of Sales; Michael Craney, President of Sales and Marketing; Sunil Khera, President, The Americas, Japan and Emerging Markets; Kevin Knarr, VP of Sales and Marketing; Scott Koenig, VP of Sales and Marketing, Generics; Bob Watson, VP of National Accounts.

139.    On August 23-26, 2014, the NACDS held its Total Store Expo at the Boston Convention Center in Massachusetts. The following representatives of Defendants, among others, attended:

(a)    **Actavis**: Andrew Boyer, President and CEO North America Generics; David Buchen, EVP of Commercial, North American Generic and International; Anthony Giannone, Executive Director

of Sales; Marc Falkin, Sr. VP of Sales; Napoleon Clark, VP of Marketing; Christina Koleto, Sr. Manager of Pricing;

(b) **Akorn and Hi-Tech**: Ed Berrios, VP of Sales and Marketing for Hi-Tech; Michael Corley, VP of National Accounts; Thomas Kronovich, VP of National Accounts; Bruce Kutinsky, Chief Operating Officer; Raj Rai, CEO; John Sabat, Sr. VP of National Accounts; M. Tranter, National Accounts Manager, Sales and Marketing;

(c) **Perrigo**: Jon Baker, Vice President, Consumer Healthcare Sales; Doug Boothe,  President Generics Division, Impax; Kelly Gillig, International Commercial Operations Manager; Christopher Kapral, Senior Vice President, Consumer Healthcare Sales; Shelley Kocur, Sr. Director, Service & Customer Supply Chains; Richard McWilliams, Senior Vice President & General Manager; John Wesolowski, Acting  General Manager;

(d) **Sandoz**: Lisa Badura, Director, Key Customers; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Anuj Hasija, Executive Director Key Customers; Armondo Kellum, Vice President, Sales and Marketing; Della Lubke, National Account Executive; Scott Smith, VP Sales & Marketing; Arunesh Verma, Executive Director Marketing; Sean Walsh, Director, Key Customers;

(e) **Taro**: Ara Aprahamian, VP of Sales and Marketing; Scott Brick, Manager, National Accounts; Kevin Kriel, Executive Director, Marketing and Business Development; Alex Likvornik, Sr. Director, Strategic Pricing and Marketing; Michael Perfetto, Chief Commercial Officer for Generic RX/OTC, US and Canada; Christopher Urbanski, Director, Corporate Accounts;

(f) **Wockhardt**: Karen Andrus, Director of Sales; Michael Craney, President of Sales and Marketing; Sunil Khera, President-The Americas, Japan & Emerging Markets; Scott Koenig, VP of Sales and Marketing, Generics; Joe Niemi, Manager, National Accounts; Bob Watson, VP of National Accounts.

140.    Executives, senior management, and salespeople from Defendants Actavis, Akorn, Perrigo, Sandoz, Taro (and its parent Sun), and Wockhardt also attended the 2015 Total Store Expo on August 22-25 at the Colorado Convention Center in Denver, and Akorn, Perrigo, Sandoz, Taro

53

(and its parent Sun), and Wockhardt attended the 2016 Total Store Expo on August 19-22 at the San Diego Convention Center in San Diego, California.

141.   Defendants are involved in other industry-focused activities through which they had the opportunity to conspire. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

142.   ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

143.   In addition to providing an opportunity to share information about the generic pharmaceutical business, these trade association events often include recreational and social activities such as golfing, theater performances, cocktail parties, and dinners, which allowed Defendants' representatives to interact with their competitors privately and outside the traditional business setting.

144.   As uncovered in the state attorneys' general investigation, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level

FILED WITH REDACTIONS – PUBLIC VERSION

executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[48]

145.    A large number of generic drug manufacturers, including nearly all Defendants here, are headquartered in close proximity to one another in New York, New Jersey or eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, and a few months before Defendants' Clobetasol products' prices hiked, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

146.    Generic pharmaceutical sales women also get together regularly for what they refer to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information.  Several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

147.    Through these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity gives them the opportunity to communicate about bids and pricing strategy, and share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.

---

[48] *See, e.g.*, *State of Connecticut et al. v. Aurobindo et al.* (D. Conn.), at ¶¶ 50-60, *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complaint.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

148.    Defendants' common membership in trade associations such as the GPhA and the NACDS, among others, and the participation of industry executives in trade association events and related activities, gave Defendants ample opportunities to exchange information concerning the pricing of their Clobetasol products and to reach and implement agreements to increase the prices of those products.

### F.    Defendants acknowledge the lack of generic drug competition

149.    Generic pharmaceutical executives frequently spoke publicly about pricing and competition in the market.   Members of the industry publicly acknowledged that they saw competition as causing a problem that generally plagued the generic drug industry—namely, low prices—and praised drug markets involving other companies that did not compete on price.

150.    After discussing the positive impact that price increases from Clobetasol would have, Akorn's CEO stated on its second quarter 2014 earnings call on August 5, 2014: "I think there is a general, we are seeing lot of price increases that are happening in the generic space and it affect some of our products as well. So, I would say overall, there is a healthier pricing environment than it was there, I would say six to eight months ago."[49]

151.    On Akorn's third quarter 2014 earnings call on November 6, 2014, Akorn's CFO discussed its and its competitors' pricing of Clobetasol: "I mean, we did – we took the price increase they took for a reason."[50]

152.    On Taro's second quarter 2014 earnings call on November 10, 2014, Taro's CEO stated that sales volumes would not decline due to increasing prices in markets for generic drugs—

---

[49] https://seekingalpha.com/article/2384615-akorns-akrx-ceo-raj-rai-on-q2-2014-results-earnings-call-transcript?part=single.

[50] https://seekingalpha.com/article/2652245-akorns-akrx-ceo-rajat-rai-on-q3-2014-results-earnings-call-transcript?part=single.

FILED WITH REDACTIONS – PUBLIC VERSION

"I don't think there will be any significant -- we have seen any significant impact of volume shifting because of price adjustments."[51]

### G.   Defendants' concerted efforts to increase prices for generic Clobetasol yielded supracompetitive profits

153.   Defendants' collusive price increases provided them with artificially inflated profits—profits that were funded in part by independent pharmacies that purchased Clobetasol.

154.   **Actavis**: According to IMS data, after entering the Clobetasol cream market in March 2015, Actavis had $23 million in sales in April through December of 2015 and $20 million in sales in the first six months of 2016.  After entering the Clobetasol cream market in August 2015, Actavis had $700,000 in sales in September through December of 2015 and $1.7 million in sales in the first six months of 2016.

155.   **Akorn**: According to IMS data, ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

156.   In its 2014 10-K, Akorn reported a $2.7 million reduction in 2013 revenues attributable to price decreases.  In its 2016 10-K, by contrast, Akorn reported a $109.7 million increase in 2015 revenues due to "price changes."  According to the Wall Street Daily, "Akorn's Clobetasol product contributed upwards of $100 million in total revenue for the company (*after the firm instituted a significant price increase in August 2014*)." (emphasis added).

157.   According to Akorn's February 2015 8-K, the company's "consolidated revenue for the fourth quarter was $227.8 million, an increase of 168 percent over fourth quarter 2013

---

[51] https://seekingalpha.com/article/2665835-taro-pharmaceutical-industries-taro-ceo-kal-sundaram-on-q2-2014-results-earnings-call-transcript?part=single.

FILED WITH REDACTIONS – PUBLIC VERSION

revenue of $85.0 million . . .   The year-over-year increase was largely driven by . . . competitive

pricing actions for products in the Akorn generic portfolio," among other things.

158.   **Perrigo**: According to IMS data, Perrigo had approximately $246,000 in revenues

from its sales of Clobetasol gel in February 2016.  In March 2016, after Perrigo increased its price

to match the other Defendants, its monthly revenues were approximately $379,000.  In June 2016

its revenues were $563,886.  Overall, according to its 2016 10-K, Perrigo's net sales attributable

to pharmaceutical products increased by $41 million in 2016 as compared to 2015.

159.   **Sandoz**: According to IMS data, Sandoz's sales of Clobetasol increased from a

little over ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

160.   In total, Sandoz had $9.6 billion in sales in 2014, a 7% increase over sales in 2013

on a constant currency basis, with its U.S. sales increasing by 14%.[52]  Sandoz's operating income

also increased, by 14%, to $1.1 billion in 2014.[53]

161.   **Taro**: According to IMS data, Taro's sales of Clobetasol (ointment, solution, gel,

cream, and emollient cream) increased from ███████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

162.   In an earnings call just a few months after increasing its Clobetasol prices, Taro's

parent company reported that it was "realizing the benefits of the previous quarter's price

adjustments in the current quarter," and in a 2016 20-F filing reported that its gross profits

---

[52] https://www.novartis.com/sites/www.novartis.com/files/2015-01-interim-financial-report.pdf.

[53] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

increased over $100 million between the fiscal years ending in March 2015 and March 2016—
"primarily the result of the full year impact of prior year price adjustments on select products."

163. **Wockhardt**: According to IMS data, Wockhardt's sales of Clobetasol (solution
only) increased from ██████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████

## H.     The Clobetasol market is susceptible to collusion

164. Publicly available data on the Clobetasol market in the United States demonstrate
that it is susceptible to cartelization by Defendants. Factors that make a market susceptible to
collusion include: (1) a high degree of industry concentration; (2) significant barriers to entry; (3)
inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized
product with a high degree of interchangeability between the products of cartel participants; and
(6) inter-competitor contacts and communication.

### 1.     Industry concentration

165. A high degree of concentration facilitates the operation of a cartel because it makes
it easier to coordinate behavior among co-conspirators.

166. Clobetasol propionate is available in ten different formulations.  Only five of the
formulations (cream, emollient cream, ointment, gel, and solution) experienced dramatic price
increases in July 2014 and are at issue in this case.  The markets for those formulations were
controlled almost exclusively by Defendants at the time of the price increases, creating conditions
favorable to an effective cartel:



60



167.    As the charts show, when Defendants implemented their price increases, Sandoz, Hi-Tech, and Taro collectively ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

When Actavis entered the Clobetasol cream and solution markets, the Defendants similarly controlled each of those markets.

168.    While the market for Clobetasol is sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the market establish that the number of manufacturers in the market was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

169.    No departures from the market by manufacturers of Clobetasol can explain the price increases.

170.    Defendants have been able to maintain supracompetitive prices for Clobetasol without significant loss of market share to non-conspirators. Thus, Defendants have oligopolistic market power in the market for Clobetasol.

61

171.    The magnitude of Defendants' price increases for Clobetasol distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price increase.  But here the increases are steep and sudden. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

### 2.    Barriers to entry

172.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

173.    There are significant capital, regulatory, and intellectual property barriers to entry in the Clobetasol markets that make such entry time-consuming and expensive.  Among other things, prospective generic manufacturers must establish manufacturing processes sufficient to safely produce large amounts of bioequivalent product.  The manufacturing facilities must follow the FDA's rigorous Current Good Manufacturing Practice regulations.  These challenges can be particularly pronounced for dermatological products like Clobetasol.  As Kal Sundaram, former CEO of Taro's parent company has explained, the FDA's testing requirements for dermatological products "makes [their] development more expensive and also it takes more time."[54]

174.    Start-up costs and regulatory oversight represent substantial barriers to entry in the generic Clobetasol markets.

175.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran

---

[54] https://seekingalpha.com/article/3645596-taro-pharmaceutical-industries-taro-ceo-kal-sundaram-q2-2015-results-earnings-call-transcript?page=8.

FILED WITH REDACTIONS – PUBLIC VERSION

commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four years."[55] In its 2014 10-K, Actavis's parent company (at the time) stated that "[t]he ANDA drug development and approval process generally takes three to four years." This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3. Demand inelasticity

176.    A product exhibits completely inelastic demand if buyers will continue to buy it regardless of the price. No product is completely inelastic, but prescription medicines come close.

177.    Demand for Defendants' Clobetasol products is inelastic largely because, while they are somewhat interchangeable with one another, they cannot be substituted for other products given their pharmacological characteristics. Additionally, the incentives of actors in the Clobetasol market are not sensitive to price, as they are in most other markets. Doctors who prescribe Clobetasol have the best therapy and not the cheapest cost in mind; patients cannot write themselves a prescription for a cheaper substitute or comfortably forgo treatment; and pharmacies have no choice but to fill the prescription as written. When Defendants increased their Clobetasol prices, independent pharmacies could not simply purchase and dispense less-expensive alternative products.

178.    In order for a cartel to profit from raising prices above competitive levels, demand must be sufficiently inelastic such that any loss in sales will be more than offset by increases in

---

[55] Senator Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

179.    The Clobetasol propionate formulations at issue in this case also do not exhibit cross-elasticities of demand with respect to the formulations not at issue in this case (i.e., foam, emollient foam, lotion, shampoo and spray).  As a result, the Clobetasol propionate formulations that are not at issue in this case did not experience sustained increased sales volumes as a result of Defendants price increases of the formulations at issue in this case:



180.    This inelastic demand gave Defendants significant pricing power, as well as an incentive to collude. Thus, Clobetasol is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

FILED WITH REDACTIONS – PUBLIC VERSION

4.      **Lack of substitutes**

181.    Clobetasol is a Class I, super-high potency topical corticosteroid used to treat a wide variety of skin conditions, including eczema, psoriasis, dermatitis, and vitiligo.  It is one of the most widely used dermatological drugs on the market today.

182.    There are typically no substitute drugs that afford patients the same level of efficacy as Clobetasol.  As a Class I corticosteroid, Clobetasol is much stronger than corticosteroids in Classes II-VII.  There are at most three other corticosteroids in Class I, each of which has different active ingredients—and thus different therapeutic properties, benefits, and drawbacks—than Clobetasol.

183.    Clobetasol is also often the only effective medicine when indicated.  Patients prescribed Clobetasol by their doctor consider it a medical necessity that must be purchased without regard to an increase in price.

184.    Clobetasol is also differentiated from other drug products because of its regulatory status.  A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to—the Reference Listed Drug (RLD) (often the brand name version of a drug). Defendants' Clobetasol products are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar ones.  Thus, a patient prescribed Clobetasol could not purchase a different drug using his or her Clobetasol prescription, regardless of the respective prices of the drugs.  Clobetasol cream is not, for example, therapeutically equivalent to halobetasol cream, even though both are Class I topical corticosteroid creams.  As a result, a patient for whom Clobetasol cream is prescribed could not purchase halobetasol cream with the Clobetasol prescription, regardless of the respective prices of the drugs.

185.    Each formulation of Clobetasol propionate has unique dermatological properties and uses, and the formulations are thus not substitutes for one another.  The ointment formulation

is, for example, generally considered the strongest delivery mechanism, and is prescribed accordingly.  Lotion is often prescribed for ear problems because it does not impair hearing as would cream or ointment formulations.  Many other characteristics likewise differentiate the indications and uses for the various Clobetasol propionate formulations.

186.    In addition, the branded version of Clobetasol does not serve as economic substitute for generic versions of Clobetasol.  Branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.  With respect to Clobetasol, as noted above, prior to the price increases for the generic Clobetasol products Sandoz discontinued Temovate emollient cream, gel, and solution and raised the prices of Temovate cream and ointment.  Temovate was therefore not an economic substitute for Clobetasol.

187.    Thus, purchasers of Clobetasol are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

**5.    Standardized product with high degree of interchangeability**

188.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

189.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

FILED WITH REDACTIONS – PUBLIC VERSION

190.    For each formulation of Clobetasol, Defendants' Clobetasol products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.    Defendants' Clobetasol cream products are thus each interchangeable, as are Defendants' Clobetasol ointment, gel, and solution products.

191.    Moreover, because Clobetasol products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service.    Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.    The primary means for one generic manufacturer to differentiate its product from another's is through price competition.[56] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6.    Inter-competitor contacts and communications

192.    As detailed above, Defendants' representatives participated in conferences and meetings organized by trade association ███████████ and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[57]

---

[56] *See, e.g.,* GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").
[57] PaRR Report.

FILED WITH REDACTIONS – PUBLIC VERSION

193.    The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

194.    DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications.  These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[58] The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion.  In addition to Actavis, Perrigo, Sandoz, and Taro, the following companies have also been identified as targets of government investigations:

(a)     **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to the DOJ's generic drug investigation.[59] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[60]

(b)     **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting

---

[58] State AG Amended Complaint ¶ 7.

[59] Zeba Siddiqui, "India's Aurobindo shares hit nine-month low on US price-fixing lawsuit," Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[60] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[61]

(c)     **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[62]

(d)     **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[63] and press reports indicate that Heritage has applied to DOJ's leniency program seeking amnesty for a cartel violation.

(e)     **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[64]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[65] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular… digoxin tablets, terbutaline

---

[61] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[62] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[63] Tom Schoenberg , David McLaughlin & Sophia Pearson, "U.S. Generic Drug Probe Seen Expanding After Guilty Pleas," Bloomberg (Dec. 14, 2016), *available at* https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[64] Impax SEC Form 8-K (July 15, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[65] Impax SEC Form 8-K (Nov. 6, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

69

sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[66]

(f)    **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[67] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[68]  On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[69]

(g)    **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic drugs" and that it had received a subpoena from the Connecticut AG seeking similar information.[70]  On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma

---

[66] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at* https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[67] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

[68] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at* https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

[69] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, available at http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[70] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[71]

(h)    **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to…generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[72] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[73]

(i)    **Par**:  In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[74] In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[75] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of

---

[71] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

[72] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[73] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

[74] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[75] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

FILED WITH REDACTIONS – PUBLIC VERSION

Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[76]

(j)     **Sun**:  On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents…relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[77]

(k)     **Teva**:  In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva USA's generic products and communications with competitors about such products."[78]

(l)     **Zydus**:  Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[79]

## IX.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.     The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

195.     Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of

facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest)

Defendants' disclosures of the existence of the government investigations and subpoenas.  Prior

---

[76] *Id.* at 31.

[77] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

[78] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.

[79] *See* Rupali Mukherjeel, "US polls, pricing pressure may hit Indian pharma cos," The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian-pharma-cos/articleshow/55301060.cms.

72

FILED WITH REDACTIONS – PUBLIC VERSION

to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Clobetasol.  And indeed, Defendants' disclosures regarding the government investigations did not indicate Clobetasol specifically.

196.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for Clobetasol.

197.    Plaintiffs are purchasers who indirectly purchased Clobetasol manufactured by one or more Defendants. They had no direct contact or interaction with any of the Defendants in this case and had no means from which they could have discovered Defendants' conspiracy.

198.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint.  For example:

(a)    Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[80]

(b)    Akorn's Code of Ethics states: "Akorn's policy is to comply fully with both the letter and spirit of all of the United States of America antitrust laws."[81]

(c)    Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as

---

[80] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct.
[81] Akorn Code of Ethics, *available at* http://investors.akorn.com/phoenix.zhtml?c=78132&p=irol-govHighlights.

73

**FILED WITH REDACTIONS – PUBLIC VERSION**

"antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."[82]

(d)     Novartis's (the parent of Sandoz and Fougera) Code of Conduct provides: "We are committed to fair competition and will not breach competition laws and regulations."[83]

(e)     Taro's Code of Conduct provides: "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition.  If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance."[84]

(f)     Taro's parent company, Sun Pharmaceutical Industries, Ltd.'s Global Code of Conduct provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."[85]

(g)     Wockhardt's Limited Code of Ethics for the Members of the Board and Senior Management provides: "Directors and Senior Management Personnel in their respective functions must abide by the laws, rules, and regulations of India and other countries, as well as the states, counties, cities, and other jurisdictions, applicable to either Company or its business."[86]

---

[82] Perrigo Code of Conduct, *available at* http://perrigo.investorroom.com/download/Code+of+Conduct.pdf.

[83] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

[84] Taro Code of Conduct, *available at* http://www.taro.com/media/oMedia/TaroCOC.pdf

[85] Sun Pharma Global Code of Conduct, *available at* http://www.sunpharma.com/Shareholder-Information/Policies/93092/Global-Code-of-Conduct.

[86] Wockhardt Limited Code of Ethics, *available at*  http://www.wockhardt.com/files/code-of-conduct.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

199.    It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

200.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.    Concealment tolled the statutes of limitations**

201.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Clobetasol.

202.    No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for Clobetasol.

203.    Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Clobetasol. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of Clobetasol they purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Clobetasol. Defendants' false statements and conduct concerning the prices of Clobetasol were deceptive as they had the tendency or capacity to mislead Plaintiffs and members

75

of the Classes to believe that they were purchasing Clobetasol at prices established by a free and fair market.

### 1.    Active concealment of the conspiracy

204.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

205.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for Clobetasol.

206.    As explained in the State AG complaint, the nature of the generic drug industry— which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[87]

207.    These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of Clobetasol to inflated, supracompetitive levels.

_____

[87] State AG Amended Complaint ¶ 13.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## 2.    Plaintiffs exercised reasonable diligence

208.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

209.    Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

210.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

211.    For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## X.    <u>CONTINUING VIOLATIONS</u>

212.    This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Defendants' prices have not returned to pre-conspiracy levels based on legitimate price inputs (raw materials, equipment costs, wages, overhead, etc.) and as a result Plaintiffs and the Classes continue to pay supracompetitive prices for Clobetasol through the present. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## XI.   DEFENDANTS' ANTITRUST VIOLATIONS

213.   During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for generic Clobetasol sold in the United States.

214.   In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of generic Clobetasol sold in the United States. These activities included the following:

(a)   Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sales and pricing of generic Clobetasol in the United States;

(b)   Participating, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to allocate customers or rig bids for generic Clobetasol sold in the United States;

(c)   Agreeing during those meetings, conversations, and communications to allocate customers for generic Clobetasol sold in the United States;

(d)   Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers for generic Clobetasol sold in the United States;

(e)   Submitting bids, withholding bids, and issuing price proposal in accordance with the agreements reached;

(f)   Selling generic Clobetasol in the United States at collusive and noncompetitive prices; and

(g)   Accepting payment for generic Clobetasol sold in the United States at collusive and noncompetitive prices.

FILED WITH REDACTIONS – PUBLIC VERSION

215.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

216.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased generic Clobetasol at inflated and supracompetitive prices.

217.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

218.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for generic Clobetasol than they would have paid in a competitive market.

219.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below.  Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to Plaintiffs.  Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class.  The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Clobetasol.

220.    The unlawful contract, combination and conspiracy has had the following effects, among others:

(a)    price competition in the market for generic Clobetasol has been artificially restrained;

(b)    prices for generic Clobetasol sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

79

FILED WITH REDACTIONS – PUBLIC VERSION

     (c)    indirect purchasers of generic Clobetasol sold by Defendants have been deprived of the benefit of free and open competition in the market for generic Clobetasol.

## XII.    <u>CLASS ACTION ALLEGATIONS</u>

221.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All privately held pharmacies in the United States and its territories that indirectly purchased Defendants' generic Clobetasol products (including Clobetasol propionate topical ointment .05% (15, 30, 45, or 60gm), topical solution .05% (15 or 50ml), topical gel .05% (15, 30, or 60gm), topical cream .05% (15, 30, 45, or 60gm), or topical emollient cream .05% (15, 30, or 60gm)) from June 1, 2014 through the present. (the "Class Period").

> This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Clobetasol products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

222.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[88] on behalf of the following class (the "Damages Class"):

> All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Clobetasol products (including

---

[88] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, <u>Connecticut,</u> Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Clobetasol propionate topical ointment .05% (15, 30, 45, or 60gm), topical solution .05% (15 or 50ml), topical gel .05% (15, 30, or 60gm), topical cream .05% (15, 30, 45, or 60gm), or topical emollient cream .05% (15, 30, or 60gm)) from June 1, 2014 through the present.[89]

This class excludes:  (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Clobetasol products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

223.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."

224.    While Plaintiffs do not know the exact number of the members of the Classes, rosters of members of national independent pharmacy organizations indicate that there are at least 20,000 members in each Class.

225.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Clobetasol and/or engaged in market allocation for generic Clobetasol sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

---

[89] Plaintiffs may seek to certify state classes rather than a single Damages Class. See ¶ 230.

81

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of generic Clobetasol sold in the United States during the Class Period;

(i)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic Clobetasol, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(j)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(k)     The appropriate class-wide measure of damages for the Damages Class.

226.    Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Clobetasol purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

227.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

FILED WITH REDACTIONS – PUBLIC VERSION

Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

228.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

229.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured pharmacies with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

230.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

FILED WITH REDACTIONS – PUBLIC VERSION

# XIII.   CAUSES OF ACTION

## FIRST COUNT

### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

231.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

232.     Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

233.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Clobetasol, thereby creating anticompetitive effects.

234.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Clobetasol.

235.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Clobetasol have been harmed by being forced to pay inflated, supracompetitive prices for generic Clobetasol.

236.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

237.     Defendants' conspiracy had the following effects, among others:

    (a)     Price competition in the market for generic Clobetasol has been restrained, suppressed, and/or eliminated in the United States;

84

(b)    Prices for generic Clobetasol provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased generic Clobetasol indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

238.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Clobetasol purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

239.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

240.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

## SECOND COUNT

### Violation of State Antitrust Statutes[90]
### (on behalf of Plaintiffs and the Damages Class)

241.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

242.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Clobetasol in

---

[90] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, Connecticut, District of Columbia, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

FILED WITH REDACTIONS – PUBLIC VERSION

unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

243.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Clobetasol and to allocate customers for generic Clobetasol in the United States.

244.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Clobetasol at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Clobetasol provided in the United States; and

(b)    participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

245.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for generic Clobetasol. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

246.    In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

247.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be

FILED WITH REDACTIONS – PUBLIC VERSION

trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

248. Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

249. **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60 *et seq*. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Clobetasol was restrained, suppressed, and eliminated throughout Alabama; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60 *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60 *et seq*.

250. **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401 *et seq.* Defendants' combination and conspiracy had the following effects: (1) price competition for generic Clobetasol was restrained, suppressed, and eliminated throughout Arizona; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401 *et seq.* Accordingly,

FILED WITH REDACTIONS – PUBLIC VERSION

Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401 *et seq.*

251.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq.*  During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Clobetasol at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Clobetasol. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Clobetasol. The combination and conspiracy alleged herein has had, inter alia, the following effects: (1) price competition for generic Clobetasol has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Clobetasol provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Clobetasol indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Clobetasol than they otherwise would have paid in the absence of

88

Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

252.    **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501 *et seq.* Defendants' combination and conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Clobetasol in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Clobetasol in the District of Columbia that were shipped by Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Clobetasol, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501 *et seq.*

FILED WITH REDACTIONS – PUBLIC VERSION

253.    ~~**Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1 *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.[91]~~

254.    **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553 *et seq.*

255.    **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101 *et seq.* Defendants' combined capital, skills

---

[91] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

or acts for the purposes of creating restrictions in trade or commerce of generic Clobetasol, increasing the prices of generic Clobetasol, preventing competition in the sale of generic Clobetasol, or binding themselves not to sell generic Clobetasol, in a manner that established the price of generic Clobetasol and precluded free and unrestricted competition among themselves in the sale of generic Clobetasol, in violation of Kan. Stat. Ann. § 50-101 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101 *et seq.*

256.    **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101 *et seq.*) Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101 *et seq.*

257.    **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771 *et seq.* Defendants' combination or

91

conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771 *et seq.*

258.    **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49 *et seq.*

259.    **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1 *et seq.* Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare

and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1 *et seq.*

260.     **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801 *et seq.*

FILED WITH REDACTIONS – PUBLIC VERSION

261.     **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010 *et seq.*

262.     **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1 *et seq.*

FILED WITH REDACTIONS – PUBLIC VERSION

263.     **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1 *et seq.*

264.     **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340 *et seq.* The conduct set forth above is a per se violation of the Act.

FILED WITH REDACTIONS – PUBLIC VERSION

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340 *et seq.*

265.    **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1 *et seq.*

266.    **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade

FILED WITH REDACTIONS – PUBLIC VERSION

in violation of North Dakota Cent. Code § 51-08.1-01 *et seq.* Accordingly, Plaintiffs and members

of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01 *et seq.*

267.   **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade

in violation of Oregon Revised Statutes § 646.705 *et seq.* Defendants' combination or conspiracy

had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and

eliminated throughout Oregon; (2) generic Clobetasol prices were raised, fixed, maintained and

stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants'

illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of

Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in

their business and property and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised

Statutes § 646.705 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all

relief available under Oregon Revised Statutes § 646.705 *et seq.*

268.   **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of

trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1 *et seq.*

Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price

competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic

Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout

Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on

Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property on

or after July 15, 2013, and are threatened with further injury. By reason of the foregoing,

Defendants have entered into an agreement in restraint of trade in violation of Rhode Island

97

General Laws § 6-36-1 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1 *et seq.*

269.　**South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1 *et seq.*

270.　**Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of

Tennessee Code Ann. § 47-25-101 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101 *et seq.*

271.   **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101 *et seq.*

272.   **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann.

FILED WITH REDACTIONS – PUBLIC VERSION

9 § 2453 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453 *et seq.*

273.    **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1 *et seq.* Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1 *et seq.*

274.    **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01 *et seq.* Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin.   During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and

FILED WITH REDACTIONS – PUBLIC VERSION

Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01 *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01 *et seq.*

273a. **Connecticut:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Conn. Gen. Stat. § 35-26 and § 35-28. Defendants' combination or conspiracy described above had the following effects during the class period: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Connecticut; (2) generic Clobetasol prices were raised, fixed, maintained and stabilized at artificially high levels throughout Connecticut. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 10, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Conn. Gen. Stat. § 35-34 and § 35-35. Plaintiffs have provided a copy of this complaint to the Attorney General as required by Conn. Gen. Stat. § 35-37.

273b. **Maryland:** Defendants have "unreasonably restrain[ed] trade" by "contract, combination or conspiracy" in violation of Md. Code, Com. Law § 11-204(a)(1). During the class period, throughout Maryland, Defendants' combination or conspiracy restrained, suppressed, and eliminated price competition for generic Clobetasol and raised, fixed, maintained, and stabilized generic Clobetasol prices at artificially high levels. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business

FILED WITH REDACTIONS – PUBLIC VERSION

and property on or after October 1, 2017, and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Md. Code, Com. Law § 11-209(b).

275.     **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Clobetasol than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

276.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

277.     Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD COUNT

### Violation of State Consumer Protection Statutes[92]
### (on behalf of Plaintiffs and the Damages Class)

278.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

---

[92] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia, Michigan~~,

**FILED WITH REDACTIONS – PUBLIC VERSION**

279.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

280.     **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471 *et seq.*  Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law.  Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

281.     **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101 *et seq.* Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at

---

Minnesota, Nebraska, ~~Nevada~~, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, ~~South Carolina~~, South Dakota, ~~West Virginia~~, Wisconsin and the U.S. Virgin Islands.

FILED WITH REDACTIONS – PUBLIC VERSION

which generic Clobetasol were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

282. **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200 *et seq.* During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Clobetasol in California, and committed and continue to commit acts of unfair competition, as defined by § 17200 *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-

104

disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200 *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720 *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720 *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Clobetasol in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Clobetasol. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants

FILED WITH REDACTIONS – PUBLIC VERSION

and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

283.    **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101 *et seq.*  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

284.    **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511 *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in

FILED WITH REDACTIONS – PUBLIC VERSION

Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

285.    **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels

FILED WITH REDACTIONS – PUBLIC VERSION

throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

286. **Georgia:** ~~Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting~~

reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Georgia Code § 10-1-370 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.[93]

287.   **Michigan:**   Defendants   have   engaged   in   unfair   competition   or   unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903 *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct,

---

[93] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

~~as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Mich. Compiled Laws § 445.903 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~

288.   **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43 *et seq.* Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43 *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

289.   **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601 *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout

Nebraska; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Clobetasol in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

290.   **Nevada:** ~~Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903 *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including~~

~~their affirmative misrepresentations and omissions concerning the price of generic Clobetasol,~~ ~~likely misled all purchasers acting reasonably under the circumstances to believe that they were~~ ~~purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading~~ ~~conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903 *et seq.*,~~ ~~and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that~~ ~~statute.~~

291.    **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1 *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Clobetasol in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

292.    **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained

FILED WITH REDACTIONS – PUBLIC VERSION

in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

293.    **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Clobetasol were sold, distributed or obtained in New Mexico and took efforts to

conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Clobetasol as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Clobetasol because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Clobetasol, including their illegal conspiracy to secretly fix the price of generic Clobetasol at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Clobetasol. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful

114

conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

294.    **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Clobetasol that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Clobetasol; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Clobetasol were misled to believe that they were paying a fair price for generic Clobetasol or the price increases for generic Clobetasol were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Clobetasol would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic Clobetasol would have a broad impact, causing consumer class members who indirectly purchased generic Clobetasol to be injured by paying more for generic Clobetasol than

FILED WITH REDACTIONS – PUBLIC VERSION

they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Clobetasol in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Clobetasol in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

295. **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-

116

concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Clobetasol created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Clobetasol in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Clobetasol in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina

Gen. Stat. § 75-1.1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

296.   **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01 *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' misleading conduct and

unconscionable activities constitute violations of N.D. Century Code § 51-15-01 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

297.   ~~**South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq.* Defendants' combination or conspiracy had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10 *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.~~[94]

298.   **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1 *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in South Dakota. Defendants deliberately

---

[94] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

FILED WITH REDACTIONS – PUBLIC VERSION

failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

299. **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101 *et seq.* Defendants agreed to, and did in fact, act in

restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101 *et*

FILED WITH REDACTIONS – PUBLIC VERSION

~~*seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.~~[95]

300.    **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and

---

[95] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

**FILED WITH REDACTIONS – PUBLIC VERSION**

members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

301.    **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35 *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Clobetasol were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Clobetasol. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Clobetasol prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Clobetasol price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Clobetasol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic

123

Clobetasol, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Clobetasol at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Clobetasol they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

## FOURTH COUNT

### Unjust Enrichment[96]
### (on behalf of Plaintiffs and the Damages Class)

302.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

303.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

304.    Defendants have unlawfully benefited from their sales of generic Clobetasol because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Clobetasol at prices that were more than they would have been but for Defendants' unlawful actions.

---

[96] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

124

**FILED WITH REDACTIONS – PUBLIC VERSION**

305.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

306.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

307.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Clobetasol while Plaintiffs have been impoverished by the overcharges they paid for generic Clobetasol imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

308.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

309.    Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

310.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Clobetasol.

311.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Clobetasol are ascertainable by review of sales records.

FILED WITH REDACTIONS – PUBLIC VERSION

312.     It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Clobetasol.

313.     It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Clobetasol, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

314.     The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Clobetasol is a direct and proximate result of Defendants' unlawful practices.

315.     The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

316.     It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Clobetasol derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

317.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Clobetasol prices remain inflated above pre-conspiracy levels.

FILED WITH REDACTIONS – PUBLIC VERSION

318.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Clobetasol.

319.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Clobetasol by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment for the following relief:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.    Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

FILED WITH REDACTIONS – PUBLIC VERSION

D.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## XV.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


Dated: April 1, 2019                                    Respectfully submitted,


                                                        */s/  Jonathan W. Cuneo*

Peter Gil-Montllor                                      Jonathan W. Cuneo
Christian Hudson                                        Joel Davidow
**CUNEO, GILBERT & LADUCA LLP**                         Daniel Cohen
16 Court Street, Suite 1012                             Victoria Romanenko
Brooklyn, NY 11241                                      Blaine Finley
202-789-3960                                            **CUNEO, GILBERT & LADUCA LLP**
pgil-montllor@cuneolaw.com                              4725 Wisconsin Ave., NW Suite 200
                                                        Washington, DC 20016
                                                        202-789-3960
                                                        jonc@cuneolaw.com

                                                        *Lead Counsel for the Indirect Reseller Plaintiffs*

**FILED WITH REDACTIONS – PUBLIC VERSION**